## LUTCHER & MOORE LUMBER CO. v. VARGO et al.

### No. 2593.

Court of Civil Appeals of Texas. Beaumont.
Nov. 15, 1934.

Rehearing Denied Nov. 21, 1934.

Williams, Lee, Sears & Kennerly, of Houston, and Alan B. Cameron, of Orange, for appellant.

D. E. O'Fiel and A. L. Shaw, both of Beaumont, for appellees.

WALKER, Chief Justice.

On the 8th day of December, 1930, Mrs. Ada Vargo and her husband, Joe Vargo, as plaintiffs, instituted this suit in district court of Orange county against Lutcher-Moore Lumber Company, a corporation, to recover the title and possession of 3.29 acres of land, a part of the Joseph Richie survey, in Orange county. They pleaded the usual allegations in trespass to try title and the statute of limitation of ten years. By an amended petition filed on the 5th day of February, 1932, plaintiffs, holding under a warranty deed from F. J. Lartigue, made him also a party defendant on his warranty. By a second amended original petition filed the 29th day of September, 1933, plaintiffs, as against the corporation defendant, pleaded also for their improvements made in good faith. The answer of the corporation defendant was by general demurrer, general denial, and not guilty. The answer of Lartigue was by general and special demurrer, general denial, and a special plea that "the plaintiffs brought this suit without any cause or reason." On trial to the court without a jury, judgment was rendered in favor of plaintiffs against defendant Lutcher-Moore Lumber Company for the title and possession of the land in controversy, sustaining their plea of ten years' limitation, and for the defendant Lartigue, as against plaintiffs, on their count for breach of warranty. In support of his judgment the trial court filed the following conclusions of fact:

"I find from the evidence that during the year 1915 Sallie A. Harvey, and husband, Tom Harvey, took possession of, claiming and fencing the tract of land herein sued for, said land being adjacent to their home tract of land, they claiming, occupying and using said land so fenced as a pasture continuously until some time in the year 1921; Tom Harvey having died in September 1919, his wife, Sallie A. Harvey, continued to claim, occupy and use said land as her property, and during the year 1921 she constructed and had constructed a building on said tract of land in which a store was run by Sallie A. Harvey and her tenants, Mrs. Harvey continuing to claim, occupy and use said land, and claiming title thereto until on or about 6th day of December A. D. 1927 when she sold same.

"* * * * I further find that Sallie A. Harvey and husband, Tom Harvey, took adverse possession, claiming title and possession to the land herein sued for in the year 1915 and held peaceable and adverse possession of said tract of land, in person and by their tenants until the sale of Sallie A. Harvey, a feme sole, to M. B. Daniels and wife,

Ruby Daniels, on the 6th day of December, 1927; that the said M. B. Daniels and wife, Ruby Daniels claimed title and held possession of, and occupied said land under said conveyance until on or about the 6th day of August A. D. 1929, the date of the Sheriff deed to Frank J. Lartigue and delivery of said land and premises thereon, and that Frank J. Lartigue claimed title and held possession of and to said land and improvements until after the 9th day of December, 1929, the date of the sale and delivery of said land and improvements to Ada Vargo and husband, Joe Vargo; that the plaintiffs, Ada Vargo and husband, Joe Vargo, have claimed and held adverse possession of said land and improvements, from date of their purchase from defendant, Frank J. Lartigue, to and including the date of the trial of this suit."

On motion of appellant, the following additional fact conclusions were filed:

"1. I find that Ned Harvey entered upon the land in question about August 27, 1921, as tenant of Sallie A. Harvey, and lived there until he turned the premises over to Ella Nixon, May 29, 1923.

"2. I find that Ella Nixon (Blackstone) entered upon the land in question May 29, 1923, and remained there about one month.

"3. I find that C. E. Lowery, the brother of Ella Nixon, entered upon the land in controversy at the same time his sister, Ella Nixon, did, and lived there approximately four months after Ella Nixon left there."

The court also found that plaintiffs held under a regular chain of title from and under Mrs. Sallie A. Harvey. Defendant Lutcher-Moore Lumber Company has duly perfected its appeal from the judgment rendered against it in the lower court.

### Opinion.

As we understand appellant's brief, it makes the following points against the judgment on the issue of limitation:

█ First, it is contended that the entry and claim of Mrs. Harvey and her husband in 1915 was not hostile, and never became hostile, to the title of the true owner. This contention is overruled. We quote as follows from the testimony of Mrs. Sallie Harvey, questions and answers reduced to narrative, italicizing the portions relied upon by appellant to establish its proposition:

-"I owned and operated a place of business on the tract as described in direct interrogatory No. 4. * * * We claimed the land and occupied it with the place of business. As stated before, I did not live on the land, but I occupied it and asserted title to the land since 1915. We claimed the land as our own from 1915 until we sold it. During the entire time I lived on said land above described we were claiming the same as our own. We claimed to own the land above described during the whole of the time that we lived on the said land.

"We acquired the land which we sold to M. B. Daniels and wife Ruby Daniels by deed dated December 6, 1927, by limitation.
* * *

"Me and my husband did take possession of this tract where Mrs. Vargo lives. That was sometime in the spring of 1915. We fixed it up. It was only about 100 or 200 yards between our north line and the concrete road —that is, the Beaumont public road—*and my husband put our fence on the road in order to have an outlet to the road; and we tried to find out who it belonged to. It wasn't worth but about $10.00 an acre at that time, and we could have bought it,* and my fence stayed up there until 1921, when the Houston Construction Co. took the fence down when they put the road through and Mr. Johnson (Jackson?) promised me to put the fence back there and he never did do it. We were in possession of that land in there when the fence was put down. *When we first entered into possession of it by fencing, our purpose in fencing it up was to have an outlet to the road. You see, we had 40 acres of land under fence.* We began claiming the land at that time. Up until 1921 we always kept the fence up. We had cattle inside and a gate right where the store is now, to go out to the road. As to what tract of land this store building is on that I spoke of as having been put on there by my father and brothers for me, we called it No Man's Land because we couldn't find out who the title was in."

Jeff Byler, the father of Mrs. Harvey, testified as follows: "As to whether or not Tom and Sallie Harvey were claiming the land from the time they fenced it until they sold it—I expect they was. Tom fenced it himself that is all I know about it. I was there all the time and I knew that they fenced it."

This testimony does not support appellant's proposition that the entry of the Harveys was in recognition of the title of the true owner, but raised the issue that the entry was hostile, and that the claim, possession, occupancy, and use of the land by the Harveys were hostile from the date of the entry. Appellant cites us to Mhoon v. Cain, 77 Tex.

316, 14 S. W. 24, where the Supreme Court said: "Defendant's own evidence is that when he entered on the land he did not know who owned it." But that testimony was not controlling. After the entry, the statement of the Supreme Court shows that the defendant made inquiries for the owner "that he might buy it, and agreed with Stone that they would buy it"; that he and Stone made frequent inquiries for the owner for the purpose of buying the land. That was not the effect of Mrs. Harvey's testimony in this case. She said she and her husband asserted a hostile claim to the land in controversy from the date of their entry in 1915. True, they called it No Man's Land because they did not know the record owner, but during that time they were asserting a hostile claim to all the land in controversy.

In 1921 a dwelling house and garage and filling station were built on this land. It is the contention of appellees that these improvements were put there by Mrs. Harvey; her husband died in 1919. The appellants contend that these improvements were built by Ned Harvey and that his possession was not in privity with the possession and claim of Mrs. Harvey. The evidence on this issue was strongly conflicting, but, in our judgment, the trial court's conclusion has reasonable support. We do not summarize the evidence on this issue, but content ourselves by quoting as follows from appellant's brief: "While the testimony is contradictory as to who built the improvements on the property, we believe that a preponderance of the evidence shows that the improvements were built by Ned Harvey. Mrs. Harvey testified: 'We put in a two room store, with a smaller one, and later Ned Harvey added one more room on the south.'"

Appellant's principal point is that Ned Harvey was not the tenant of Mrs. Harvey, but of its grantors; Ochiltree and Brown; and also that Mrs. Nixon and her brother C. W. Lowery were not in privity with Mrs. Sallie Harvey, but held as tenants of Ochiltree and Brown; and that the trial court's conclusions to the contrary are without support in the evidence. The record shows that Ned Harvey entered into a written lease with Ochiltree and Brown; and that Mrs. Nixon and her brother, C. W. Lowery, took over that lease from Ned Harvey, and then entered into a new lease with Ochiltree and Brown. But the following additional facts were shown, raising the inference that Ned Harvey was a tenant of Mrs. Sallie Harvey: Ned Harvey, a cousin of Mrs. Sallie Harvey's husband, and her brothers and father assisted her in building the improvements above described. We quote as follows from Mrs. Sallie Harvey's testimony, questions and answers reduced to narrative:

"My husband's name was T. J. (Tom) Harvey. My husband is dead; he died in Orange County, Texas, on the 18th day of September, 1919. I knew Ned Harvey; he was a first cousin to my husband. I am not personally acquainted with Mrs. Ella Nixon and doubt whether I would know her if I should see her. I saw Mr. C. E. Lowery twice in about 1922; I doubt whether I would know him if I should see him. Mrs. Nixon stayed on the property which I later sold to M. B. Daniels and wife Ruby Daniels about five or six days, until I found that she was there and I told her to move. C. W. Lowery also stayed there about five or six days, the same that his sister, Mrs. Nixon, stayed there. I never had any transaction or dealings with C. W. Lowery concerning the property which I later sold to M. B. Daniels and wife Ruby Daniels except I paid Mrs. Nixon, and her brother, C. W. Lowery, for stock of goods which they had placed in the store building when I found out that they were in my building; they gave me a bill of sale, acknowledged, either before Judge Sholars or Judge McCarver. As to how far away this was from the land sold to M. B. Daniels and wife Ruby Daniels, my residence was about three hundred yards south of this land.

"I lived on the land which I sold to M. B. Daniels and wife Ruby Daniels about thirty years. We acquired this land by limitation. My brothers and father, J. F. Byler, W. J. Byler and J. M. Byler built the original improvements or buildings on the land which I sold to M. B. Daniels and wife Ruby Daniels. I did not live on the land involved in this suit; I owned and operated a place of business there. My residence was immediately adjoining and on the south of this piece of land.

" * * * We put in a two room store, with a smaller one, on this particular tract, and later Ned Harvey added one more room on the south. I know under what arrangements Ned Harvey entered into possession of those premises. We were the ones that built the store. I was building the house, and me and his wife were to have the store to run, and he and my brother were going to run the garage. We were going to split it up like that. At that time my husband wasn't living, and Ned Harvey didn't enter into possession with my consent. I didn't do any-

thing about it but tell him to move, and he told me he would take his own good time about moving, but I finally persuaded him to move. I can't remember now how long it was he lived there. He stayed for about six weeks and then he added one room to the place. My husband was a rice farmer and we had a lot of wagons and teams and he used them, and went to Tulane and bought the lumber and hauled it over there for this store room, and my daddy and two brothers and oldest son and another man built this place, and Ned Harvey was supposed to have paid the man, and paid Mr. Fuller for the lumber and garage but Mr. Fuller said he never paid him a nickel. I don't know anything about the carriage. I would rather not go into the store arrangement we were going to have. After we had the trouble I never did go over there. I asked him to move, and let me buy his stock, but he wouldn't and he sold it to somebody else; to Mrs. Ella Nixon, or Mr. Lowery. I think they were brothers and sisters. That is the way I had to get possession of my building back."

This evidence raised the issue that Ned Harvey and his wife entered into possession of the land in controversy under an agreement with Mrs. Sallie Harvey whereby Mrs. Sallie Harvey and the wife of Ned Harvey were to operate the store and Ned Harvey and his brother were to operate a garage—all on the land in controversy. The trial court believed Mrs. Sallie Harvey's testimony, which had the effect of making Ned Harvey the tenant of Mrs. Sallie Harvey. It follows that, after "the trouble" between them, Ned Harvey wrongfully surrendered his possession to Mrs. Nixon and her brother. As Ned Harvey's possession was in privity with Mrs. Sallie Harvey, so was that of Mrs. Nixon and her brother, holding under Ned Harvey; and, by the mere act of attorning to Ochiltree and Brown, Ned Harvey, Mrs. Nixon, and Lowery did not render their possession hostile to that of Mrs. Sallie Harvey. In Fowler v. Simpson, 79 Tex. 611, 15 S. W. 682, 684, 23 Am. St. Rep. 370, our Supreme Court quoted with approval the proposition: "It is very well settled that where a tenant is in under one title no attornment is valid which is made to any one not in privity with that title."

See, also, Lockin v. Johnson (Tex. Civ. App.) 202 S. W. 168, 169; Wilson v. Beck (Tex. Civ. App.) 286 S. W. 315.

True, Mrs. Harvey testified that "Ned Harvey didn't enter into possession with my consent." Careful study of the testimony of Mrs. Harvey makes the issue clear that, in giving this testimony, she meant to say that she did not agree for Ned Harvey to hold possession hostile to her claim. No other construction can be given this statement, for Mrs. Harvey testified that Ned Harvey and his wife took possession of the land under a contract with her whereby he and his brother were to operate the garage and his wife and she were to operate the store.

The judgment of the lower court is affirmed.